UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

 TRICIA A.,

                          Plaintiff,                           **DECISION AND ORDER**

      v.

                                               1:20-CV-01601-EAW

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
_____

## INTRODUCTION

       Represented by counsel, Plaintiff Tricia A. ("Plaintiff") brings this action pursuant to Title II of the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB").  (Dkt. 1).  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

       Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Dkt. 16; Dkt. 19).  For the reasons discussed below, Plaintiff's motion (Dkt. 16) is granted to the extent that the matter is remanded for further administrative proceedings and the Commissioner's motion (Dkt. 19) is denied.

## BACKGROUND

Plaintiff protectively filed her application for DIB on March 10, 2017.  (Dkt. 9-3 at 2; Dkt. 9-5 at 2-4).[1]  In her application, Plaintiff alleged disability beginning July 23, 2016.  (Dkt. 9-5 at 4).  Plaintiff's application was initially denied on June 28, 2017.  (Dkt. 9-3).  At Plaintiff's request, a hearing was held before administrative law judge ("ALJ") Roxanne Fuller on February 26, 2019.  (Dkt. 9-2 at 32-56).  On July 17, 2019, the ALJ issued an unfavorable decision.  (*Id*. at 13-25).  Plaintiff then requested review by the Appeals Council, which the Council denied on September 11, 2020, making the ALJ's determination the final decision of the Commissioner.  (*Id.* at 2-7).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the [Social Security Administration ("SSA")], this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted); *see also* 42 U.S.C. § 405(g).  The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)

---

[1]    When referencing the page number(s) of docket citations in this Decision and Order, the Court will cite to the CM/ECF-generated page numbers that appear in the upper righthand corner of each document.

(quotation omitted).  It is not the Court's function to "determine *de novo* whether [the claimant] is disabled."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).  However, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law."  *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## II.    Disability Determination

An ALJ follows a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act.  *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986).  At step one, the ALJ determines whether the claimant is engaged in substantial gainful work activity.  *See* 20 C.F.R. § 404.1520(b).  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities.  *Id*. § 404.1520(c).  If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled."  If the claimant does have at least one severe impairment, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings").  *Id*. § 404.1520(d).  If the impairment meets or medically

equals the criteria of a Listing and meets the durational requirement (*id*. § 404.1529), the claimant is disabled.  If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments.  *See id*. § 404.1520(e). The ALJ then proceeds to step four and determines whether the claimant's RFC permits the claimant to perform the requirements of his or her past relevant work.  *Id*. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled.  If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled.  *Id*. § 404.1520(g).  To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of the claimant's age, education, and work experience.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation omitted).

## DISCUSSION

I.    **The ALJ's Decision**

In deciding whether Plaintiff was disabled, the ALJ applied the five-step sequential evaluation analysis set forth in 20 C.F.R. § 404.1520, and noted that Plaintiff met the insured status requirements of the Act through December 31, 2021.  (Dkt. 9-2 at 15-24). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful work activity since July 23, 2017, the alleged onset date.  (*Id.*).

At step two, the ALJ found that Plaintiff suffered from several severe impairments: cervical dystonia, migraines, degenerative disc disease, anxiety, and depression.  (*Id.*).  The

ALJ also determined that Plaintiff's carpal tunnel syndrome, hypothyroidism, and premature ventricular contractions were non-severe impairments. (*Id*. at 15-16).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (*Id*. at 16-18). Before proceeding to step four, the ALJ concluded that Plaintiff retained the RFC to perform sedentary work, except that she could occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, crouch, kneel, crawl; frequently reach, including overhead, with both arms; frequently handle and finger with both hands; occasionally be exposed to moving mechanical parts and unprotected heights; occasionally operate a motor vehicle, and perform routine and repetitive tasks. (*Id*. at 18).

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a bartender and waitress. (*Id.* at 23). With the help of the VE, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as the occupations of a document specialist, printed circuit board screener, and toy stuffer. (*Id.* at 24). Accordingly, the ALJ concluded that Plaintiff was not disabled from the date of her application through the date of her decision. (*Id.* at 25).

## II.   <u>Remand is Required</u>

Plaintiff advances several arguments in support of her motion submitting that the ALJ erred in: (1) assessing her credibility; (2) evaluating the opinion of her treating neurologist Tomas Holmlund, M.D.; (3) assessing the combined effect of her exertional and non-exertional limitations on her ability to function when formulating the RFC; and

(4) relying on an incomplete hypothetical scenario posed to the VE to determine that there were jobs in the national economy that Plaintiff could perform. (Dkt. 16-1). She argues that the matter should be reversed solely for calculation of benefits because the record supports a finding of disability. (*Id*. at 34). The Court agrees with Plaintiff that the matter should be remanded; however, it disagrees that reversal for calculation of benefits is warranted at this time.

As a general matter, pursuant to the fourth sentence of 42 U.S.C. § 405(g), a court is authorized to enter judgment affirming, modifying, or reversing the Commissioner's decision with or without remanding the cause for rehearing. Section 405(g) allows reversal and remand solely for calculation of benefits without a rehearing "where [the] Court has . . . no apparent basis to conclude that a more complete record might support the Commissioner's decision." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). Where "the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *see also Giddings v. Astrue*, 333 F. App'x 649, 655 (2d Cir. 2009) ("[A] decision to reverse and direct an award for benefits should be made only when . . . substantial evidence on the record as a whole indicates that the [c]laimant is disabled and entitled to benefits." (internal citations omitted)). However, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard, a court should remand the case to the Commissioner for the further development of the record." *Speruggia v. Astrue*, 05-CV-3532 (NGG), 2008 WL 818004, at *14 (E.D.N.Y. Mar. 26, 2008) (internal citation omitted). Here, the Court

finds that a remand for further administrative proceedings is required because of the ALJ's failure to resolve the gap in the record related to Plaintiff's functional limitations stemming from her impairments, particularly cervical dystonia and degenerative disc disease.

In formulating Plaintiff's physical RFC, the ALJ relied on opinions of two non-treating physicians—A. Vinluan, M.D., state agency medical consultant, and HongBiao Liu, M.D., consultative examiner. (Dkt. 9-2 at 22-23). She assigned both opinions little weight because Plaintiff's limitations resulting from degenerative cervical and lumbar discs disease were far more extensive than was originally identified by Dr. Liu, and were more consistent with sedentary work, as opposed to light work opined by Dr. Vinluan. (*Id.*). The ALJ indicated that the findings contained in both opinions, particularly those related to Plaintiff's mild limitations for prolonged walking, bending, and kneeling, were inconsistent with the objective medical evidence showing Plaintiff's upper and lower cervical straightening, and degenerative spondylosis at C6-C7 and L2-L3 levels. (Dkt. 9-3 at 12; Dkt. 9-8 at 327-28).

Having found the above opinions—the only opinions of record that discussed Plaintiff's limitations in functional terms—inconsistent with the record, the ALJ went ahead and formulated Plaintiff's RFC based on her review of the remaining objective medical evidence without the benefit of an opinion of either of Plaintiff's treating neurologists that would address the nature of Plaintiff's limitations derived from cervical dystonia and degenerative disc impairments.[2] This is troublesome considering the extent

---

[2]     Because Plaintiff's claim was filed before March 27, 2017, the ALJ was required to apply the treating physician rule and give controlling weight to opinions of Plaintiff's

and the length of treatment provided by Plaintiff's neurologists Tomas Holmhuld, M.D., and Leonard Kaplan, D.O., who had treated Plaintiff's complex symptoms stemming from both impairments for years well before she applied for disability. *Richter v. Comm'r of Soc. Sec.*, No. 18-CV-806, 2020 WL 1445119, at *3 (W.D.N.Y. Mar. 25, 2020) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . . Until [s]he satisfies this threshold requirement, the ALJ cannot even begin to discharge h[er] duties . . . under the treating physician rule.") (internal citation omitted).

That is not to say that the ALJ is always required to rely on a medical opinion to formulate Plaintiff's RFC. *See Tankisi v. Comm'r Soc. Sec*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) (where "the record contains sufficient evidence from which an ALJ can assess . . . residual functional capacity," a medical source statement or formal medical opinion is not necessarily required). Indeed, when the record contains sufficient evidence from which the ALJ can access the claimant's RFC, *see Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013), or when the medical evidence shows a relatively minor physical impairment allowing the ALJ to render a common-sense judgment about a claimant's functional capacity, an ALJ's reliance on a formal medical opinion may not be necessary. *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) ("[T]he ALJ's RFC conclusion need not

---

treating sources if they were well supported by medically acceptable clinical and laboratory diagnostic techniques, and were not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2).

perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence.").

However, where, as here, Plaintiff has been in treatment for years for complex chronic impairments, and where the record does not relate her diagnoses to any work-related functional abilities, the ALJ was not qualified to make an RFC determination without relying on a medical opinion about Plaintiff's abilities to perform work on a continuous and substantial basis. *See Kim E. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01784 CJS, 2022 WL 797462, at *10 (W.D.N.Y. Mar. 16, 2022) ("Where there are medical records from treating physicians, and 'the treatment notes and test results from the claimant's treating physicians do not assess how the claimant's symptoms limit [his] functional capacities,' the record is incomplete, warranting remand.") (internal citation omitted), *see also Perkins v. Berryhill*, No. 17-CV-6327-FPG, 2018 WL 3372964, at *4 (W.D.N.Y. July 11, 2018) (ALJ cannot render a common-sense judgment about a claimant's functional capacity where the record "contain[s] complex medical findings and do[es] not suggest only minor impairment").  Indeed, the record here is devoid of any medical authority provided by Plaintiff's treating sources who opined as to the nature of her functional limitations stemming from cervical dystonia and generative disc disease that would support the ALJ's finding that Plaintiff was capable of performing sedentary work with additional limitations.  *See Manago v. Kijakazi*, No. 20-CV-1251 (MKB), 2021 WL 4408966, at *8 (E.D.N.Y. Sept. 26, 2021) (remand was warranted where the ALJ failed to develop the record when he did not seek functional assessments from plaintiff's treating physicians and drew conclusions from the record that consisted only of medical notes and

records); *Skupien v. Colvin*, No. 13-CV-403S, 2014 WL 3533425, at *6 (W.D.N.Y. July 16, 2014) ("As a general rule, where the transcript contains only diagnostic evidence and no [supporting] opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact [an acceptable medical] source, order a consultative examination, or have a medical expert testify at the hearing.") (quotations and citations omitted).  The lack of such authority was especially problematic in light of the evidence suggesting that Plaintiff's ability to sit for over six hours, and frequently reach, handle and finger with both hands, might be more limiting than was determined by the ALJ, and the VE's testimony that there would be no jobs in the national economy for an individual who would be limited to only occasional reaching overhead, as well as occasional fingering and handling.  (Dkt. 9-2 at 54-55).

The record demonstrates that Plaintiff, a 46-year-old woman at the time of the application, first started exhibiting pain related to cervical dystonia—an uncurable condition associated with involuntary contraction of neck muscles causing uncontrollable tilt or twist of one's head to one side—since she was 18 years old.  While Plaintiff's symptoms were initially mild, it took approximately ten years for them to deteriorate to the point where Plaintiff started to experience limitations in her activities.  (Dkt. 9-6 at 25; Dkt. 9-8 at 138). Dr. Holmlund officially diagnosed Plaintiff with cervical dystonia by sometime around 2000, and subsequently, over the years, documented gradual deterioration of Plaintiff's symptoms from her having disabling neck pain to eventually developing a "constellation of issues," which included numbness and tingling in her hands and arms causing her to drop things, joint pain and weakness through spine, limited range of motion

of her neck, head tilt and rotation, pulling pain and heaviness in her legs, lower back pain with numbness and tingling, sleeplessness, and migraines.  (Dkt. 9-6 at 18-29; Dkt. 9-8 at 125-28, 130-32, 134-37, 217-18, 279-81, 392; Dkt. 9-9 at 100).  Plaintiff's symptoms were worse when she was sitting, standing, lifting, or holding a steering wheel while driving. (*Id.*).  As her symptoms worsened, Plaintiff began treatment with muscle relaxers and Botox injections administered every three months to control her neck pain, and eventually was approved to receive medical marijuana in early 2018 when Botox injections no longer provided relief for her symptoms.  (Dkt. 9-9 at 19-21).

As for Plaintiff's degenerative disc disease, Dr. Kaplan treated Plaintiff's lower back pain continuously since 2015, routinely documenting her complaints of numbness and tingling of her arms and legs, and increased neck and lower back pain, which was exaggerated by sitting, standing, and walking.  (Dkt. 9-8 at 225-27, 230-32, 238-40, 251-53, 313-15; Dkt. 9-9 at 108-11).  Plaintiff routinely demonstrated restrictions in all movements of her cervical spine and moderate limitations in her lumbar spine.  (Dkt. 9-8 at 225-27).  Dr. Kaplan treated Plaintiff with injections in the lumbar area, which had improved her pain to some extent for a short period of time, but did not relieve her lower back pain altogether.  (Dkt. 9-9 at 103-05, 108-11).  Despite receiving periodic injections, Plaintiff continued to experience neck and lower back pain, numbness and tingling in her arms and hands, and eventually identified new symptoms of having burning pain in the lumbar back with constant pulling in her legs, which made her unable to sit or lay down for prolonged periods of time.  (Dkt. 9-8 at 313-15; Dkt. 9-9 at 103-05, 108-11).  Plaintiff's migraines have also worsened over the years in frequency and intensity, where she had

approximately 25 headaches per month that typically lasted for several days with photophobia, phonophobia, osmophobia, and nausea. (Dkt. 9-9 at 121-24).

While the record is silent as to a medical opinion of either of Plaintiff's treating neurologists regarding her work-related limitations caused by cervical dystonia and degenerative disc disease, it contains a medical marijuana eligibility form submitted by Dr. Holmlund to the New York State Department of Health on January 22, 2018. (Dkt. 9-8 at 338). In the form, Dr. Holmlund indicated that Plaintiff had "severe or chronic pain resulting in substantial limitation of function." (*Id.*). Plaintiff argues that this form represented a medical opinion that the ALJ was required to consider and assign controlling weight to in accordance with the treating physician rule. (Dkt. 16-1 at 25-28). The Court is not persuaded that the medical marijuana approval form was a "medical opinion" in its true meaning under the regulations because even though it was offered by the acceptable medical source and reflected Dr. Holmlund's judgment about the severity of Plaintiff's impairments, it was silent as to Plaintiff's diagnosis, prognosis, and, most importantly, her physical or mental abilities to work despite her impairments. *See* 20 C.F.R. § 404.1527(a)(1) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Although the Court does not find an error in the ALJ not affording controlling weight to the form submitted by Dr. Holmlund as was suggested by Plaintiff, it agrees that it was improper for the ALJ to completely ignore it in her analysis and not follow up with Dr. Holmlund regarding the impact of Plaintiff's cervical dystonia

on her ability to function in a work setting.  *See Kathryn D. v. Comm'r of Soc. Sec.*, No. 19-CV-1550-LJV, 2021 WL 195342, at *2 (W.D.N.Y. Jan. 20, 2021) (when a medical opinion is not a "medical opinion" as defined by the regulations, "the ALJ still must analyze what is behind the opinion or recontact the provider to request a translation of the opinion into language that fits the Social Security context").

It bears noting that the Second Circuit has long recognized the proposition that the ALJ's duty to develop the record is not absolute, and, as such, does not arise where the ALJ already possesses sufficient evidence to make an RFC determination.  *See* 20 C.F.R. § 404.1520b(a) ("If all of the evidence we receive, including all medical opinion(s), is consistent and there is sufficient evidence for us to determine whether you are disabled, we will make our determination or decision based on that evidence."); *see also Rosa*, 168 F.3d at 79 (the ALJ has the affirmative duty to develop the record such that there are no inconsistencies that would require further inquiry).  Consistent with that notion, the regulations do not mandate that the ALJ recontact a claimant's treating physician in each case, *see Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (the ALJ "is not required to develop the record any further when the evidence already presented is adequate for [the ALJ] to make a determination as to disability") (internal citations omitted), unless the record is inconsistent or insufficient to determine whether the claimant is disabled, *see* 20 C.F.R. § 404.1520b(c);[3] *see also Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012)

---

[3]     This provision was amended effective March 27, 2017.  Because Plaintiff's claim was filed prior to that date, the Court applies the version of the regulation that was in effect at the time of Plaintiff's application.

(duty to re-contact a treating physician may arise when there is "a conflict or ambiguity" between the physician's treatment reports).

Here, the ALJ's duty to develop the record regarding Plaintiff's work-related limitations was heightened by the inconsistencies related to Plaintiff's symptoms, which the ALJ acknowledged in her decision but selectively relied on to deny Plaintiff's application. Specifically, in support of her finding that Plaintiff was able to perform sedentary work, the ALJ largely focused on Plaintiff's physical examinations by some of her treating providers, when Plaintiff demonstrated full strength in her upper and lower extremities, normal gait and stance, used no assistive devises or help to ambulate, change for exam, or get on and off exam table, as well as Plaintiff's periods of temporary improvement following injections in her neck and back. (Dkt. 9-2 at 19-22). Indeed, records from Plaintiff's primary care physician James J. Panzarella, D.O., and his registered physician assistant Tatyana Belous, RPA-C, both of whom treated Plaintiff for years before and during the relevant period, were largely silent as to Plaintiff's complaints of neuro- or musculoskeletal problems. (Dkt. 9-7 at 129, 306-07, 355, 358-59, 362-64, 394-97, 401; Dkt. 9-8 at 3, 385-91). Their examinations of Plaintiff's neck and lower back were essentially normal with Plaintiff demonstrating symmetrical and nontender neck, full range of motion in her neck and back, and no joint pain or headaches. (*Id.*). However, such records stood in stark contrast with Plaintiff's reports of disabling symptoms and abnormal examination findings made by her treating neurologists, particularly by Dr. Holmlund who treated Plaintiff during the same timeframe as Dr. Panzarella. In fact, Dr. Holmlund, as well as Dr. Kaplan, routinely noted Plaintiff's restricted range of motion in

her neck and lumbar spine, head tremor and tilt, bilateral numbness and tingling in her hands, arms, and legs, burning pain, and severe migraines with aura.  (Dkt. 9-7 at 42-43, 46-47; Dkt. 9-8 at 130-32, 134-37, 217-18, 225-27, 230-32, 251-53, 274, 279-81, 313, 392; Dkt. 9-9 at 100, 103-05, 108-11).  Plaintiff's positive single leg test and hand tremors were also noted during her consultative examination.  (Dkt. 9-8 at 325-28).  State agency consultant Dr. Vinlian also opined that Plaintiff had limited fingering and could only occasionally do fine manipulations due to her bilateral hand tremors, and was to avoid exposure to light, noise, and vibration due to her migraines.  (Dkt. 9-3 at 12-13).  Dr. Panzarella's findings were also inconsistent with the result of Plaintiff's MRI and x-rays that demonstrated significant deterioration in Plaintiff's cervical spine at all levels since 2006, multi-disc protrusions, broad disc herniation, diffuse spondylosis, and foraminal stenosis at C4-C5 and C5-C6 levels, as well as moderate degenerative changes in her lumbar back.  (Dkt. 9-7 at 39-40; Dkt. 9-8 at 329-30).

The ALJ selectively relied on portions of the record that showed temporary improvement in Plaintiff's symptoms, largely disregarding the fact that Plaintiff continued to have serious ongoing symptoms even after years of treatment that significantly deteriorated during the relevant period.  *See Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d. Cir. June 17, 2022) (the ALJ erred when he selectively focused on normal mental health examinations and periods of improvement without considering plaintiff's continued psychiatric symptoms after years of treatment and steadily increasing medication) (summary order).  The ALJ's reliance on Plaintiff's treatment of her neck and back impairments with injections to suggest the inconsistency between the limiting effect

of her symptoms and the objective medical evidence documenting Plaintiff's struggles with cervical dystonia and degenerative disc disease was misplaced.  *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (finding error, in the context of mental illness, "for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working").  The record demonstrates that despite receiving periodic back injections, Plaintiff continued to have neck and lower back pain, numbness and tingling in her arms and hands, and identified additional symptoms of having burning pain in her lumbar back and constant pulling pain in her legs.  (Dkt. 9-8 at 313-15; Dkt. 9-9 at 103-05, 108-11).  Similarly, Plaintiff's neck injections with Botox, while providing temporary relief at some point during treatment, did not alleviate her neck pain or tremor.  In fact, Dr. Holmlund indicated that even though Plaintiff was "doing fairly well with Botox[,][she was] significantly bothered by pain, particularly the last month before Botox treatment."  (Dkt. 9-8 at 392).  Despite receiving injections, Plaintiff continued to have pain and a pulling sensation centered around her neck, as well as back pain and tremors.  (*Id*.; Dkt. 9-9 at 19-21).  Because Botox injections were no longer providing relief for her pain, Plaintiff was worried that she was becoming immune to Botox, and, as a result, requested to use medical marijuana, which provided some help with her sleeplessness, but did not limit her pain.  (*Id*.).

Plaintiff's hearing testimony also supported the proposition that the only available treatment to control her symptoms caused by cervical dystonia was ineffective, and that the limitations stemming from the disease might have been more disabling.  Plaintiff confirmed that despite receiving treatment, there was nothing that relieved her pain

completely.  (Dkt. 9-2 at 40, 49-50).  She noted that her tremors had gotten worse over the years resulting in constant involuntary body movements with pulling or straining sensation, which was similar to "ringing a washcloth where you have opposite forces pulling against it."  (*Id*. at 36-50).  Plaintiff testified, and the ALJ observed at the hearing, that a part of her body would always try to move in one direction forcing her to constantly keep it still, which, in turn, would cause the other body parts to pick up the movement.  (*Id*.).  Plaintiff indicated that the injections were "hit and miss," and even though they "froze the muscle" so that it did not allow her head to fall to her left shoulder, they did not reduce her pain.  (*Id*. at 50).  To assist herself with the pulling sensation and to keep her head from falling to her left shoulder, Plaintiff had to hold her head with her hand; however, it would neither alleviate the pulling sensation in her neck, nor lessen the movement in the rest of her body.  Plaintiff indicated that her body tremors, severe migraines, the tilt of her head, compromised hand grip and coordination, as well as the need to use one of her hands to hold her head, were the reasons why she no longer was able to work as a bartender and waitress—a job that she performed for 16 years.  (*Id*. at 46, 48, 52).  Her head tilt and body tremors, visible to her colleagues and customers, caused daily questions about her condition.  (*Id*. at 51).  Plaintiff spent her days managing her severe weekly migraines that lasted on average for a day and a half, or stayed in bed all day due to her severe symptoms.  (*Id*. at 41-42, 45; Dkt. 9-6 at 20-23).

Therefore, due to the ALJ's failure to develop the record regarding Plaintiff's abilities to function in a work setting, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence.  *Baez v. Comm'r of Soc. Sec.*, No. 17-

CV-3595 (MKB), 2018 WL 4688951, at *9 (E.D.N.Y. Sept. 28, 2018) ("[W]here 'an ALJ fails to adequately develop the record in reaching a conclusion as to a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence.") (internal citation omitted).  Consequently, the Court declines to address the parties' remaining arguments without the benefit of an adequately developed record.  Accordingly, remand for further proceedings is appropriate to allow the ALJ to supplement the record with a medical assessment of Plaintiff's functional limitations stemming from her complex impairments so that ALJ can properly formulate Plaintiff's RFC and resolve conflicting evidence contained in the record.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 16) is granted to the extent the matter is remanded for further administrative proceedings and the Commissioner's motion for judgment on the pleadings (Dkt. 19) is denied.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:       September 12, 2022
             Rochester, New York